IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**PAUL ALBRECHT and
CHRISTINA RAINES,**

    **Plaintiffs,**

vs.                                                                         Case No. 5:04cv121-MCR/WCS

**FORD MOTOR CREDIT COMPANY
d/b/a KIA FINANCIAL SERVICES,**

    **Defendant.**

_____/

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant has moved for summary judgment. Doc. 41. The motion is accompanied by a memorandum, doc. 42, a statement of facts, doc. 43, and affidavits, doc. 44. Notice was given to Plaintiffs of their obligations in filing a response to this motion and they were notified that the motion would be determined on or after February 2, 2005. Doc. 48. Plaintiffs filed a response, doc. 57, a memorandum, doc. 58, a statement of facts, doc. 59, and evidence, doc. 60.

Plaintiffs filed their complaint in state court, and the complaint was removed to this court by Defendants based upon diversity of citizenship. The court adopted the last

report and recommendation, denying Plaintiffs' motion to remand and denying Defendant's motion to dismiss or for a more definite statement.  Docs. 33 and 50.

**Allegations of the Amended Complaint, doc. 10**

Plaintiffs bring a state tort claim of slander of credit, that is, defamation, against Defendant.  They allege that they had a motor vehicle loan from Defendant.  The motor vehicle securing this loan was in an accident on April 30, 2003, and was a total loss.  On May 12, 2003, when the total loss had been determined, Plaintiffs allege that they contacted Defendant and obtained an agreement from Defendant that Plaintiffs could suspend monthly payments and that Defendant would "await payment from Plaintiffs' insurance prior to billing Plaintiffs for any remaining balance."  Doc. 10, ¶ 7.

Plaintiffs allege that the insurance payment was received by Defendant on about June 20, 2003, and that on July 23, 2003, Defendant billed Plaintiffs for the remainder, about $159.  *Id*., ¶¶ 8 and 9.  Plaintiffs allege that on July 24, 2003, Defendant published a false written report to credit agencies containing defamatory matter about Plaintiffs, stating that Plaintiffs were indebted to Defendant, had refused to pay, were seriously delinquent, and that the debt to Defendant had been charged off as a bad debt.  *Id*., ¶ 11.  Plaintiffs allege that the report was known by Defendant to be false when made.  *Id*., ¶ 12.  Plaintiffs allege a variety of consequential damages, including emotional damages.  *Id*., ¶¶ 15-18.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265

(1986).  If it does so, the burden shifts to the Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id*.  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence is insufficient.  There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof.  Anderson v. Liberty Lobby, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  However, "the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor."  WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988); Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999) ("We are required to resolve all reasonable inferences and facts in a light most favorable to the nonmoving party.").

**Rule 56 Evidence**

   **Defendant's Evidence**

Ford Motor Credit Company agreed to take assignment of the sale contract from the dealership and Ford Credit handled the loan administration.  Doc. 44, affidavit of McDonald, ¶ 4.  McDonald avers that Ford Credit requires a customer to continue making regular monthly payments when a vehicle financed by Ford Credit is destroyed.

*Id.*, ¶ 7.  McDonald states that one or both of the Plaintiffs were told that they had to make monthly payments until the insurance company paid.[1]  *Id.*, ¶ 9.

McDonald states that Defendant received a check from Plaintiffs for their regular monthly payment for May, 2003, but it was dishonored by Plaintiffs' bank.  *Id.*, ¶ 10.  No payment was received in June either.  *Id.*, ¶ 11.

McDonald states that Defendant always applies insurance payments to the principal balance of the loan.  *Id.*, ¶ 13.  Past due payments and late charges are already owed by the customer and are not covered by insurance.  *Id*.

McDonald states that on July 1, 2003, the primary insurer made payment, and this was applied to the principal balance of the loan and then to past-due amounts and late charges.  *Id.*, ¶ 16.  On July 2, 2003, a "10 day letter" was sent to Plaintiffs advising that a small balance (presumably the $159) still remained.  *Id.*, ¶ 17.  No payment was received, but Albrecht called on July 15, 2003, to ask about the balance.  *Id.*, ¶ 19.  He was told that a ten-day letter had been sent and had expired.  *Id*.  McDonald states that on July 23, 2003, Pam Youngblood requested approval to charge off the balance because the account was 47 days past due.  *Id.*, ¶ 20.  The charge off occurred on July 25, 2003.  *Id.*, ¶ 21.  The three major credit reporting agencies automatically receive credit information from Defendant.  *Id.*, ¶ 23.  On August 5, 2003, payment of the balance was received from Plaintiffs.  *Id.*, ¶ 22.

---

[1] McDonald does not state that he personally so advised Plaintiffs, and he is not competent to testify to what someone else said.  It is presumed he is merely stating that this is the policy as known by him.  In any event, Albrecht avers differently, and thus there is a genuine dispute of material fact as to this matter.

Pam Youngblood states in her affidavit that she received a copy of the insurance settlement check on June 5, 2003. Doc. 44, affidavit of Youngblood, ¶ 8. She avers that she tried to call Plaintiffs at their residence on July 8, 2003, but there was no answer. *Id*., ¶ 9.

Youngblood avers that she concluded that the small amount owing would not be paid. *Id*., ¶¶ 15, 19. She noted that the ten day period had expired, the account was 47 days past due, and that Albrecht had "responded to a collections call by requesting a print out of the interest on the account." *Id*., ¶ 10. She also relied upon the fact that the customers no longer had possession of the vehicle. *Id*., ¶ 17. On July 23, 2003, Youngblood requested approval of a charge off as to the small balance remaining. *Id*., ¶ 11. Black's Law Dictionary defines a "charge off" as the elimination of an item from assets as an "uncollectible account receivable or debt," and is the equivalent of a bad debt. Doc. 42, attachment.

Carol Elliott filed an affidavit in which she states that she is the branch manager of Florida Mortgage Trust in Bonita Springs, Florida. Doc. 44, affidavit of Elliott, ¶ 1. She worked with Albrecht, Raines, and Gately in their attempt to obtain a residential real estate mortgage. *Id*., ¶ 2. She said that in September, 2003, Albrecht provided her with a letter from Kia indicating that the charge off had been removed from their credit reports. *Id*., ¶ 14. On September 16, 2003, Elliott faxed a third good faith estimate of closing costs, which had been reduced to about $9,000 except for prepayment of hazard insurance, and told Albrecht that Plaintiffs' credit score was being "reworked" because the charge off had been removed. *Id*., ¶ 16. On September 17, 2003, she received a letter from Albrecht and Raines withdrawing their request for a mortgage,

stating as reasons that the interest rates were too high (6.5 to 7%), they had not agreed to the cost of the appraiser, and did not like other terms of the mortgage. *Id*., ¶¶ 17 and 18 and attached letter. They did not mention the problem with the charge off and their credit nor did they mention the decision of Gately to withdraw as a partner. *Id*. and ¶ 19. Elliott asserts that the delay in the mortgage was not due to the charge off, but because the "mortgage could not be submitted until all documentation was provided by the applicants."[2] *Id*., ¶ 21. She states that the application was never submitted to any potential lender and was never denied by any lender. *Id*., ¶¶ 23 and 24.

Defendant has also submitted an affidavit from a potential expert witness, Don Coker. Doc. 44, affidavit of Coker.[3] Coker expressed the following opinions:

1. The charge off was accurate because the past-due balance went unpaid. *Id*., ¶ 10.

2. Plaintiffs were not qualified for the mortgage they sought, and caused the negative effects upon their credit by the mismanagement of their finances. *Id*., ¶¶ 12 and 13.

3. It is not a standard practice in the industry to allow a borrower to suspend monthly payments when the vehicle that secures the loan is destroyed because this would allow possible fraud (intentional destruction of the vehicle) when someone got behind on payments. *Id*., ¶¶ 17 and 18. Coker states that that is not the accusation here, however, but is provided only to explain the standard practice. *Id*., ¶ 18 n. 1. Also, the contract did not permit Plaintiffs to suspend payments. *Id*., ¶ 19.

---

[2] Defendant asserts in the statement of facts, ¶¶ 31 and 32, that Plaintiffs did not verify the employment of Raines or provide evidence that they would receive a trust fund payment to cover closing costs, citing the affidavit of Elliott, but those specific statements are not in Elliott's affidavit. It will be assumed that Defendant could come forward with evidence as to this, but ultimately this is immaterial to the adjudication of the motion for summary judgment.

[3] It will be assumed without deciding that Coker will be permitted to give these opinions as an expert.

4. The charge off was finally corrected on all three major credit reporting agencies on September 23, 2003, by the issuance of a corrected report by Experian. *Id*., ¶ 23.

5. Plaintiffs seek but cannot recover as damages the loss of 2/3 (their share) of the proposed $168,500 mortgage loan because a loan always must be paid with interest. *Id*., ¶ 28. The only damage would have been the interest rate differential over the projected life of the mortgage reduced to present value, and the average life of a 30 year fixed rate mortgage loan is five to seven years. *Id*., ¶ 31.

6. Plaintiffs would not have been approved for this loan for a variety of reasons set forth in the affidavit. *Id*., ¶ 29.

Coker also sets forth reasons why Plaintiffs may not be entitled to other but smaller items of economic damages. Coker does not address emotional damages or injury to reputation.

**Plaintiffs' evidence[4]**

Paul Albrecht states in his affidavit that his wife, Christiana Raines, had a car accident in their Kia on April 30, 2003, and in mid-May, the car was deemed to be a total loss. Doc. 60, affidavit of Albrecht, ¶ 2. When he learned that the car was a total loss, Albrecht states that he called "Kia" and asked for an extension of time to allow insurance to pay. *Id*., ¶ 4. He states that he informed Kia that he and his wife "would pay any final balance after Progressive and our gap insurance paid." *Id*. He states that he also "informed Kia that our May payment would not be honored so that Kia would be able to bill our insurance for the balance from the date of the accident." *Id*. Albrecht avers that: "Kia's representative agreed to await our final payment until our insurance

---

[4] Defendant's hearsay objections, raised in the motion to strike, doc. 61, will be adjudicated in the following footnotes.

had paid."[5]  *Id*., ¶ 5.  As corroboration of this, Albrecht points to a contact log entry obtained in discovery which shows the following entry for a telephone call on May 24, 2003: "SAID CAR TOTALED 043003 INS SUPPOSED TO PAY."  Defendant agrees that it keeps computerized notes of telephone conversations or other communications related to an account, and that the notes are made contemporaneously with the actions being noted.  Doc. 44, affidavit of McDonald, ¶ 5.

Albrecht states further that in mid-July, he called Kia and was informed that Kia had received $6,168.50 from Progressive Insurance and that a balance of $150 remained.  Doc. 60, affidavit of Albrecht,, ¶ 8.  Albrecht states that he "requested a statement from Kia detailing principal, interest, and late charges, and Kia had refused to provide those details."  *Id*.

Albrecht states that at the end of July, he received a statement from Kia that $159.70 (or $159.69) was due.  *Id*., ¶ 9.  The statement was dated July 23, 2003.  *Id*.  He states that he paid this amount by check mailed on July 31, 2003.  *Id*., ¶ 11.

Albrecht states that on August 25, 2003, he received a statement from his Chase credit card showing a large interest rate increase.[6]  *Id*., ¶ 23.  He called Chase and was informed that he had a negative mark on his credit and this had caused the interest rate increase.[7]  *Id*., ¶ 24.  Albrecht then obtained a credit report from Experian and found

---

[5] This is not hearsay, as argued by Defendant (doc. 61, ¶ 18) because it is offered for the fact that this was said to Plaintiff, not for the truth of the statement. Plaintiff is, of course, competent to testify to what he said.

[6] This is not hearsay as argued by Defendant.  Doc. 61, ¶ 18.

[7] This is inadmissible for the truth of why the interest rate was increased, but is admissible for the fact that it was said.

that a debt to Kia of $158 had been charged off because the debt was past due for 30 days, with the charge off in July, 2003, and the past due status in June, 2003. Doc. 60, Albrecht affidavit, attachment.

Albrecht states that on August 26, 2003, the mortgage broker, Carol Elliott informed him that due to the charge off, Plaintiffs' credit scores had dropped 100 points and the only mortgage available would be in the range of 11 to 12 percent.[8] *Id*., ¶ 27. Plaintiff Albrecht said he called Kia Financial Services and "demanded that they remove the negative mark from our credit" but "they refused." *Id*., ¶ 29.

Also attached to the affidavit is a letter that Albrecht sent to Kia on August 26, 2003. *Id*. In this letter, he states that in the second week of July, he called Kia and was informed that the insurance had made payment, that his account was delinquent in the amount of $150, that a letter had been sent to him allowing 10 days to make payment and the 10 day period had expired. *Id*. Christina Raines states in her affidavit that during the first week of September, 2003, she called Kia Financial Services, asked to speak with a supervisor, and spoke with a man who identified himself as Rocky. Doc. 60, affidavit of Raines, ¶¶ 34-35. She avers that she "asked Rocky why the charge off had been made and he said that it was 'in order to get more money out of you' and 'there is nothing you can do about it.' "[9] *Id*., ¶ 36. On September 12, 2003, apparently in response to Plaintiff's August 26th letter, though that is not stated, Kia wrote to

---

[8] This is admissible for the fact that it was said. It is material, because it explains why Gately withdrew from the deal as explained ahead.

[9] This is admissible for the fact that it was said. It is material as to the issue of malice and the possible motive to charge off the debt so quickly.

Albrecht to state that the charge off was in error, that the error had been corrected, and the credit agencies had been notified. *Id*., attachment to Albrecht affidavit.

Amber Gately states in her affidavit that she had originally agreed to be a one-third partner with Plaintiffs in the purchase of a lot and the building of a home. Doc. 60, affidavit of Gately, ¶¶ 1-9. She states that she had checked the credit of Plaintiffs and it was good. *Id*., ¶ 3. The closing was to have been on August 30, 2003. *Id*., ¶ 11. She states that in the last week of August, she heard from Christina Raines that "a charge off had been put on their credit from their wrecked car."[10] *Id*., ¶ 14. Raines also told her that with that charge off on their record, the best interest rate they could get would be eleven or twelve percent.[11] *Id*., ¶ 15. Raines also told her that the charge off was wrong and that she and Paul Albrecht were trying to have it removed from their credit.[12] *Id*., ¶ 16. Ms. Gately further avers that in the second week of September, 2003, she told Plaintiffs that she "wanted out of the mortgage."[13] *Id*., ¶ 21. She states that on September 16, 2003, she met with Plaintiffs and they showed her a fax from their lender "saying the charge off was a mistake,"[14] but "it was too late" and she and her fiancé had made other plans. *Id*., ¶ 24. She concludes that she decided not to go through with the

---

[10] This is admissible for the fact it was said. Further, it is not disputed by Defendant.

[11] This is admissible for the fact it was said. It is material to the decision of Gates to withdraw from the transaction.

[12] This is admissible for the fact it was said. It is not admissible for the truth of the statement.

[13] This is not hearsay.

[14] This is admissible for the fact it was said. Further, it is not disputed by Defendant.

purchase "because of the charge off on the credit of Paul Albrecht and Christina Raines, the delay it caused our mortgage, and I didn't want a mortgage at eleven or twelve percent interest."[15]  *Id*., ¶ 26.

Finally, Plaintiffs have filed a copy of Defendant's 2003 Form 10-K filed with the Securities and Exchange Commission.  In that annual report, Defendant states that it has a practice in its North American operations "of charging off accounts more than 120 days delinquent."  *Id*., attachment.

**Legal Analysis**

### Proof of elements of the claim

Defendant cites Bass v. Rivera, 826 So. 2d 534, 535 (Fla. 2d DCA 2002) for the elements of the tort of defamation:  "The elements of a cause of action for defamation are:  '(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff.' "   Defendant contends that Plaintiffs cannot prove the first element, that the charge off was a false statement, and the fourth element, that plaintiff suffered injury.

There is a genuine dispute of material fact as to the first element.  A charge off labels a debt as a bad debt, that is, a debt which the debtor did not pay as agreed and is so unlikely to pay in the future that the debt should no longer be carried as an asset of the lender.  This labels the debtor a dead beat when it gets into the hands of a credit agency.  Plaintiff Albrecht has presented competent evidence (his own affidavit) that this last $159 was not a bad debt and should not have been charged off.  Albrecht states

---

[15] Gates is competent to testify to her reasons for withdrawing from the transaction.  This is not hearsay.

Case No. 5:04cv121-MCR/WCS

that an agent of Defendant orally agreed to suspend monthly payments until the insurance payments had been made.  Defendant contends that this was contrary to its policy.  However, if a jury were to believe Albrecht, then Albrecht and Raines did not owe any further payments, interest, or late fees until the insurance payment was received, and may not have owed the final $159, to the extent that this contained charges accruing after April, 2003.

There is also a genuine dispute of material fact as to whether the debt should have been charged off on July 23, 2003.  Neither Albrecht nor Raines specifically avers that they did not receive the ten-day letter sent out on July 2, 2003, and from Defendant's evidence, it must be presumed that they did receive it.  Albrecht admits that he was told about the ten-day letter in mid-July, after the ten-day period had expired.  Albrecht also avers that when he was told in mid-July that he and Raines owed about $159 more, he asked for an explanation of this charge, but he never received one.  He states that he and Raines received the written bill sent on July 23, 2003, they promptly paid it by check mailed on July 31, 2003.  However, Defendant had charged off the debt on July 23, 2003, so this payment was ineffective to prevent the charge off.  Finally, Raines states that she was told by someone who she thought was a supervisor for Defendant that the charge off had been done to get more money out of Plaintiffs, and there was nothing they could do about it.  Plaintiffs have shown by means of Defendant's form 10-K filed with the Securities and Exchange Commission that it is Defendant's usual policy to wait 120 days before charging off a delinquent account.  From this evidence, a jury might conclude that the debt was not a bad debt and should not have been charged off on July 23, 2003.

Defendant also contends that Plaintiffs cannot show injury, the fourth element of a cause of action for defamation, and thus the entire claim must fail. Defendant is not seeking partial summary judgment, that is, a limitation of damages, but full summary judgment, a dismissal of the claim for failure to produce evidence of any damages. This argument is not persuasive because proof of damages is not an element of this tort.

A remarkably similar case is one cited by Plaintiff, <u>Matthews v. Deland State Bank</u>, 334 So. 2d 164 (Fla. 1st DCA 1976). In that case, the plaintiff had financed a new car with Defendant. In February, March, and April, 1968, he began to experience problems making payments, and in April, the car was involved in a collision. According to plaintiff, the defendant agreed that plaintiff's debt would be satisfied if he returned the car. The bank planned to repair it with its own insurance and to resell it. 334 So. 2d at 165. Plaintiff surrendered the car. Three years later he found he had impaired credit because the bank's records showed he still owed $1,700. *Id*. The court held that there was no need to find actual malice under these circumstances:

> A disregard for the truth in reporting credit transactions, especially when coupled with the failure to correct the inaccuracies, constitutes libel *per se*. *Vinson v. Ford Motor Credit Company*, 259 So. 2d 768 (Fla. App. 1st, 1972). Where words are libelous per se, malice is presumed as a matter of law. *Johnson v. Finance Acceptance Company of Georgia*, 118 Fla. 397, 159 So. 364 (1935).

334 So. 2d at 166.

Likewise, in <u>Vinson v. Ford Motor Credit Company</u>, 259 So. 2d 768 (Fla. 1st DCA 1972), the buyer of an automobile returned the car to the defendant at a time when there was no default in payments and was told that the voluntary surrender of the car would be accepted, that "Ford Motor Credit would be happy to finance a car in the future

for" the buyer. Defendant Ford Motor Credit then reported to a credit agency that the car had been "repossessed" and that the buyer owed $2,266.00. 259 So. 2d at 769-770. The court held that a lay person could distinguish between a voluntary return, which "usually results from an agreement that no further liability exists on the buyer's part," and a "repossession," which means that the buyer failed to keep up with payments. 259 So. 2d at 770. The court held that when the defendant reported that the buyer's payment record was unsatisfactory and that it had repossessed the automobile, this constituted libel *per se*. *Id*.

Plaintiffs likewise allege libel *per se* as defined by these cases. They have come forward with evidence of a disregard for the truth in making the charge off and a refusal to correct the charge off. Libel *per se* is actionable "without the necessity of showing any special damages, the imputation being such that the law will presume that any one so libeled must have suffered damages." Johnson v. Finance Acceptance Co. of Georgia, 118 Fla. 397, 159 So. 364, 365 (Fla. 1935).

> In the case of words actionable *per se* their injurious character is a fact of common notoriety, established by the general consent of men, and the court consequently takes judicial notice of it. *They necessarily import damage and, therefore, in such cases general damages need not be pleaded or proved but are conclusively presumed to result, and special damages need not be shown to sustain the action*. Words actionable *per quod* are those whose injurious consequences must be established by allegation and proof.

*Id*. (emphasis added).

Further, even if this were an action for libel *per quod*, there is evidence that Plaintiffs' credit reputation suffered injury for a short period of time. Some damages would be awarded for that period of injury. Further, damages for mental suffering is

sought by Plaintiffs and is recoverable. "[I]t is well settled that mental suffering constitutes recoverable damages in cases of negligent defamation . . . ." Kush v. Lloyd, 616 So. 2d 415, 422 (Fla. 1992), *citing*, Miami Herald Publishing Co. v. Brown, 66 So. 2d 679, 681 (Fla. 1953). Defendant's motion does not address either of these forms of damages. Thus, even were true that Plaintiff cannot prove any economic damages, the remedy would not be to dismiss the complaint.

**Whether Plaintiffs' claims are preempted by the Fair Credit Reporting Act**

Defendant's motion for summary judgment repeats the arguments previously made in response to the motion to dismiss, doc. 3, and again in its objections to the first report and recommendation, doc. 37. The preemption arguments were rejected. Doc. 50, adopting first report and recommendation, doc. 33.

The gist of the controversy is explained in the last report and recommendation. The issue is how to reconcile two preemption provisions of the Fair Credit Reporting Act, that is, 15 U.S.C. §§ 1681t(b)(1)(F), the more recently enacted provision, and 1681h(e). Defendant continues to rely primarily upon the reasoning of Stafford v. Cross Country Bank, 262 F.Supp.2d 776 (W.D. Ky. 2003). The district courts have adopted three or four different ways to try to reconcile these two statutes.

After reconsideration, the reconciliation that I recommended in the last report and recommendation remains the most sensible. There still is no Circuit Court of Appeals decision on this controversy. Since that recommendation was entered, District Judge Evans of the Northern District of Georgia has adopted essentially the same reasoning as I recommended. Johnson v. Citimortgage, Inc., 351 F.Supp.2d 1368 (N.D. Ga. 2004). As Judge Evans points out, the conclusion in Stafford v. Cross Country Bank

Case 5:04-cv-00121-MCR-WCS   Document 63   Filed 03/04/05   Page 16 of 17

Page 16 of 17

leads to an oddity, that once a furnisher of information like Defendant receives notice from a "credit reporting agency" that the information is disputed, all further state claims are preempted.  351 F.Supp.2d at 1374-1375, quoting Judge Carnes in Neal v. Equifax Information Services, Inc., No. 1:03-CV-0761-JEC (order dated Mar. 11, 2004).  This is nonsensical.  As Judge Evans wrote, rejecting the temporal solution of Stafford v. Cross Country Bank:

> Such a reading gives effect to both § 1681t(b)(1)(F) and § 1681h(e) without having the illogical effect of protecting a furnisher of information more after [it] has received notice of a dispute than before it has received such notice.

351 F.Supp.2d at 1375.

The reasoning of Judge Evans, relying upon Carlson v. Trans Union, LLC, 259 F.Supp.2d 517 (N.D. Tex. 2003) is also persuasive.  351 F.Supp.2d at 1375.  It is concluded that § 1681t(b)(1)(F) only preempts causes of action ("prohibitions") created by state statute, and leaves § 1681h(e) operative as it is written, providing another kind of preemption for state common law torts.

Defendant argues that even if § 1681h(e) applies, Plaintiff cannot prove malice.  Malice under this statute is congruent with the common law standard.  Cousin v. Trans Union Corp., 246 F.3d 359, 375 (5th Cir.), *cert. denied*, 534 U.S. 951 (2001).  Under Florida law discussed above, Plaintiffs have alleged libel *per se*, and malice is presumed.  They need not prove malice.

Even if Plaintiffs had to prove malice, they have come forward with evidence from which a jury could conclude that the charge off was malicious.  "Express malice under the common law of Florida, necessary to overcome the common-law qualified privilege,

is present where the primary motive for the statement is shown to have been an intention to injure the plaintiff." Nodar v. Galbreath, 462 So. 2d 803, 806 (Fla. 1984); Bass v. Rivera, 826 So. 2d 534, 535 (Fla. 2d DCA 2002). The charge off occurred 47 days after Defendant asserts that the debt had become overdue, significantly less than the 120 days that Defendant's Form 10-K seems to indicate is the period of default that should elapse before a debt is written off. Plaintiffs have presented evidence that Defendants promised them that they need not make monthly payments until the insurance proceeds were received. Plaintiffs have also come forward with evidence that one of Defendant's supervisors told Raines that the charge off was intended to get more money out of Plaintiffs, and that they could do nothing about it. This evidence, if believed by the jury, shows malicious intent.

Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment, doc. 41, be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 4, 2005.

s/   William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**